the principles of which Pat and Wayne Felder are here with the Court this afternoon, and we appreciate this opportunity to argue before you. Your Honor, it's our contention that the District Court committed two principal errors in granting the defendant's motion to dismiss. The first deals with the definition of price and how you determine whether something is below average variable cost, and the second regarding the geographic market that Felder's alleged in its complaint. Let me ask you a question. Yes, ma'am. Are you an antitrust lawyer? I mean, that would be helpful, because I'm not. I don't specialize in it. I've learned a good deal. You've learned more than you ever cared to know. That's correct, Your Honor. Let me ask you something. The real force behind what happened to your client here is General Motors. That's correct, Your Honor. And so, as I understand, I don't see why this is the typical predatory pricing case when you look at the people who your client was competing with on the direct level were these all-star people. But the real force behind all this is General Motors. How does that affect your case? Well, as you mentioned, we're in competition with all-star, and all-star is selling the parts, these collision parts for which there's an aftermarket alternative to the body shop below all-star's average variable cost. That's our contention. GM is the driving force because they're colluding with all-star to induce them to sell below cost. But under a predatory pricing scheme, the claim is against your competitor who's actually making the sale, and that's all-star in this case. But GM is conspiring with them. The ordinary predatory pricing case, though, doesn't quite work the way this one does because you don't have General Motors up at the top of the heap here giving the discount at the end of the day, the pricing discount to your competitors. Well, that's correct. This is an unusual case because usually you would have just what the issue would be whether the competitor is selling below cost. Would you have been any better off if you had named General Motors as a co-conspirator? Well, we have, Your Honor. They have been alleged to be a co-conspirator. They're in the case. General Motors is in the case.  That's correct, Your Honor. We have not alleged that they are directly engaged in the predatory pricing. As I told Judge King, we can't bring that claim directly against them. But where does their liability lie then? Their liability lies as a co-conspirator, as somebody who's inducing and causing all-star to violate the antitrust act. Well, it does lie within predatory pricing. That's correct. No, it lies as a conspirator to commit predatory pricing or to commit an antitrust violation. In fact, I would also note— Why are they in the case? If you can't tag them with a predatory pricing case, then this is a predatory pricing case. Because the statute also makes it illegal to conspire to commit an antitrust violation. And I would note GM has— What antitrust violation have they committed? They're conspiring with All-Star to commit an antitrust violation in the form of predatory pricing, selling below average variable cost. And GM has never raised the issue before the district court or this court that it's not a proper defendant or that it should be dismissed or that there isn't a claim for conspiracy under the Antitrust Act. That issue is not before the court. How is All-Star selling below price when this whole program guarantees them, as I understand it, a 14 percent profit? By definition, they're making money now. They are making money on the back end, but the price—when we talk about price, price is always seen as what the consumer, in this case the body shop, pays for a part. Right, but doesn't this rebate really just reduce their cost? And I don't know that it really so much matters whether you put it into price or cost, but they're buying these parts for GM. That's a big cost, right? That's the main cost of selling these things is getting the parts from GM. And they get a rebate, so that's reducing their cost. But they're not—they're getting— The price ends up being greater than their cost. Only on the back end. But the harm is done to the felders at the end of the—when this part is sold. And all the cases that talk about predatory pricing all involve you look at the sale to the consumer. And it's where the point of competition is. And the point of competition is when All-Star sells to a body shop at a price that's 33 percent below the price that the felders are charging. GM, instead of this rebate program, just said we're going to cut the price of the parts. We're not here. We're not here today. If GM had sold the part at a lower price, we're not here today. Why—from an economic reality standpoint— Why isn't that it? Why does it matter if they pay it two months later, the rebate? Because they're doing this to so far reduce the cost. Because, one, they want to keep their profit margin. They don't want to reduce their price to All-Star. They want to keep their margins high. And, second, they're doing it to get rid of these competitors like felders. And essentially they are going in the back door when they can't go in the front door. They're sneaking around and getting in the back door. That's correct, Your Honor. They're trying to do an end run around the statute here by setting up this pricing scheme. The general principle is what you can't do through the front door, you can't do through the back door. It's just as legal as a—to say the least, it's a vernacular legal principle. But you said they could do it through the front door. You said GM could just lower these parts from the front end. But they're not selling— They're not doing it. But here they're doing it to drive—to protect their profit margin and then to help drive—they're doing this to drive the felders out of business by being able to go back and sell a part that's 33% below the cost. And that's a classic case of—that's the case of predatory pricing where a competitor is selling below its cost in this case. And price— Considering their cost, we shouldn't consider that they're getting a rebate. That's what I don't understand. Because if you look at All-Stars accounting, at year end, they're going to include these rebates to reduce their cost. I mean it's just basic economics it seems. Because I think when you talk about rebates in the context of these predatory pricing cases, you're talking about the benefit to the consumer, the benefit to the body shop. And the competition is being harmed here when this part is being sold 33% below what the competitor is charging. Yeah, but the purpose of antitrust laws, I mean as we have learned in the last, I guess, 30 years or more, is to protect the consumer and is not to protect the competitors. Well, the consumer gets harmed after the felders go away and after— Time being, the consumer is being rewarded with cheaper— They're being rewarded. They're getting a benefit in the front end, Your Honor, at this time. They get harmed later when they have to pay a higher price. Yeah, they get harmed if they squeeze your client out of the business. And then they are there to raise prices then. But that hasn't happened. Well, that's correct, Your Honor, but the antitrust law doesn't require that the recoupment take place in order for there to be an action. It's just that there's a threat or a possibility, a probability of recoupment in order for you to have a violation of the antitrust statute. So it is inevitable that if this practice is not stopped, the consumer is going to be injured because one can expect as a matter of economic reality that General Motors is going to raise their price. Correct, Your Honor, and that's, in fact, what we would contend that they're already doing with those parts that GM has and All-Star have a monopoly on, the parts for which there is no aftermarket alternative, the other 80%. Those parts are not being reduced as part of this program. Those parts are still being sold at a significant profit margin to both All-Star and GM. And one need only look to what they're doing there and the fact that they're keeping the prices high there to assume that they're going to do the same thing when they corner the market and there's nobody else left to sell an aftermarket part. And that's exactly what's happening here, that they're driving the competitors out. They've driven three other competitors of the Felders out of business. The Felders themselves have been significantly harmed by this action. Are we concerned about that? I mean, under antitrust laws, are we concerned about the Felders? We're concerned about the consumer, though. Well, the consumers are harmed when the Felders aren't there to keep the prices there. As far as antitrust laws are concerned, and I'm asking you this, as far as antitrust laws are concerned, Felders can be forgotten because we're headed for what the consumer benefits, what harms or benefits the consumer. Well, what harms the consumer is that. Am I right about that, though? That's correct, Your Honor, but I think what harms the consumer is that there's no more competition in the marketplace. I'm sorry, Your Honor. Won't there be? I mean, you're talking about OEM parts. I mean, General Motors parts. Correct. So what you're saying is at the end of the day, so to speak, after this grand plan of General Motors is successful, your Felders goes out of business, but then at that point, the aftermarket parts that are not General Motors parts have a sway. I mean, the consumer is just going to have to buy non-General Motors parts or pay a lot more money for General Motors parts. Right? Isn't that what's going to happen? They're going to have to pay for – they're going to – well, General Motors parts will be the only ones available. Excuse me? No, no. There are aftermarket parts, aren't there? No, but I'm saying they're squeezing them out by this. So they're squeezing out all the aftermarket parts. They're squeezing out the manufacturers of the aftermarket parts, not people like your clients. For recoupment to work, GE has to squeeze the manufacturers out, and that's where there's these high barriers to entry, right, in manufacturing these parts, not just in retail. It's not the manufacturers. It's the sellers. It's not – the recoupment is All-Star is doing the recoupment. It's not GM. It's All-Star who's in direct competition. How are you going to get people out, manufacturers of these alternate parts, non-GM parts? How can GM make these super profits? Because there's going to be people out there – as long as they're being manufactured, there'll be people selling them. The facts as alleged in the complaint, Your Honor, is that nobody is coming into this market to sell these parts. What about Keystone? Keystone is surviving because it's diversified. It's a large conglomerate. It sells multiple product lines. It sells multiple things, and it's able to stick around and withstand the forces on the market that are being – that are pressuring it. Like General Motors. Correct. It's a large conglomerate. Am I right that if they drive the Felders out of business, and people like the Felders out of business, then they raise the prices on the OEM parts. The non-OEM parts will have a better market because they will – they're cheaper. If there's somebody who's able to come into the market to sell the non-OEM parts. Right, right. That's the issue. And as we've alleged – excuse me? Why are there barriers to entry for just reselling these parts? I understand why there would be high barriers for the manufacturers. But why – if GM is all of a sudden saying, oh, we're selling these, we're super-pride profits, why can't someone else just come in and start ordering these non-OEM parts and selling them out of a warehouse? Because it takes a lot of work to get a warehouse and a place to sell parts like this. It's not something as simple as selling, you know, grain or milk or eggs. It takes – it's an inventory-intensive business. And the fact is, as we've alleged, there have been no new entrants into the market in several years. But aren't the parts – straighten me out if I'm wrong about this. Aren't the parts that are really the subject of this parts for which there are non-OEM parts available in the market? Because you're competing with people who sell non-OEM parts that are cheaper. And as I understand General Motors' whole plan of attack here – and it is a plan of attack on Felder's – as I understand that, it's designed to make it possible for Felder's to sell competing parts to non-OEM parts at a lower price. So they can compete more effectively with the non-OEM parts. So there are already people manufacturing these parts and selling them at lower prices. Isn't that right? Well, I think you have two different types of collision parts. You have those parts that are only manufactured – that can only go in a GM automobile. And then you have OEM parts, but that also have an aftermarket alternative. And that's what Felder's sells. And Felder's sells the aftermarket parts that have OEM competition generally at a lower price than what it has normally or traditionally been the OEM price. But now through this competition, through the inducement by GM, these OEM parts have now come in and are selling them at a significant discount, 33% below the price. Okay, Mr. McClellan, you save some time for rebuttal. Yes, thank you, Your Honor. Mr. Radlauer, we hear from you. Thank you. David Radlauer, arguing for defendants. Also GM? Yes, I am actually GM's lawyer here in New Orleans, or among GM's lawyers in New Orleans. Good. So we have the force behind all this, huh? The force behind it, yes. Judge King, I'm hesitant to admit this because it's going to raise your expectations, but I've devoted most of my career to the practice of antitrust law. So I'm going to try to put all of this in perspective. And what I think we all need to remember here is we're hearing a motion to dismiss an amended complaint after some discovery. And after the time in which the district court gave a detailed roadmap of what it thought needed to be alleged in order to state a claim of predatory pricing in the circumstances here. And even after getting information, lots of it, thousands of pages, spreadsheets, cost information, this complaint still lacks any factual content on many, if not most, of the essential components of the claim. So while we will talk about plausibility, I want to make it clear that facts are missing. This complaint is a hodgepodge of conclusions which are not to be taken as true under the pleading standards. And it includes concessions that are absolutely critical, and it also includes lots of contradictions. What it doesn't include is a lot of the discussion we just had. You won't find that in the complaint. Let's start with GM and the questions that came out. Why is GM here? GM designed a nationwide program that was designed to enable its authorized parts dealers to sell GM-manufactured parts at highly competitive prices. How do we know that? Because the program materials are attached to the complaint, and that's what they say. All right. Now, what does that mean? Yes, you're right. It guarantees a 14% profit under the circumstances of the program. The main complaint here has to do with the timing of that payment. I'm going to come back to that in a moment, but before I get there, I want to talk about GM and what's not in the complaint. GM is not alleged in the complaint to at any time, any time, before the rebate, after the rebate, doesn't matter. GM is not alleged to have ever sold any of its dealers a part below cost, period. Below GM's cost? Below any measure of GM's cost. That's not there. They asked a lot of questions in discovery about that. That's not there, period. The question about and discussion about other manufacturers of parts, there is not one word in this complaint about other manufacturers of parts made by anyone, made by Ford, Chrysler, whoever supplies Felder's. We don't know because Felder's doesn't tell us. We don't know who supplies Keystone because Felder's doesn't tell us. There is nothing in the complaint at all at the manufacturing level except that GM manufactures these parts and instituted this nationwide program, period. Now, going to the program and the argument that we just heard, it's a temporal argument. They just admitted that if the discount, the rebate, had been paid before All-Star resales to the body shop, they've got nothing to complain about and we can all go home. What they're trying to say then is there's a commercial, a competitive distinction of some sort between paying a rebate before the resale by All-Star or after the resale by All-Star. The first one, they admit is okay, we go home. The second one, they say, uh-uh, you can't do it. It seems to me, though, that you are allowing All-Star to engage in predatory pricing and then defending the legal claim against them by the rebate. I mean, they have no doubt about the fact, it seems to me, that they are engaged in predatory pricing in a vernacular, non-technical kind of way. They are selling to them below their price if they didn't get the 14 percent rebate. I have to disagree with that. Okay. And I think the case law of this circuit and of the other circuits disagrees with it as well for the following reason. Whenever you look at price, you look at the entire transaction. And there's a little confusion here about what transactions we're looking at that go with the rebate. Please, let me – I hate to interrupt you, but you've just accused us of – I'm not interrupting you. I mean, it looked like I was wanting to ask a question, but I didn't do it. I'm sorry. The – ah, I lost where I was. Okay. The transaction between All Star and a body shop. By the way, I have to digress here. None are alleged in the complaint. It's astonishing. The only facts alleged about this program in the complaint are the program materials themselves in a hypothetical way. Never is there an allegation in this complaint, not one that says All Star sells at a price that they can't compete with because they never tell us what prices All Star is actually selling at, and they never tell us what prices they're actually selling at, and they never say at any time in this complaint, here's a real world transaction. A body shop put out a repair order. We went to bid on it, and they got it. Okay, I am going to ask this question. And was ample discovery time allowed? Ample discovery time allowed before motions were allowed? The judge gave them, as I understood it, essentially unlimited discovery. They asked their questions. Defendants answered them, and this was between complaints. Now, going back to what's going on with the transaction. Transaction number one, the one that the rebate is involved in, it's obvious. GM's a seller. All Star's a buyer. All Star gets a rebate. All Star, it's the buyer, gets a rebate. I'm going to tell you exactly what's in the complaint about that and what's in the briefs about that and the concessions that are made. Well, I mean, I can't. No, this is important because the question of temporal is on everyone's mind. That's the linchpin of the whole case. On page six of their reply brief, quote them, my opposition, rebates which in order to the benefit of the purchaser are properly considered in the calculation of the price. That's not the only time. I understand all of that, and I understand the arguments, and I understand. I say I do. And I understand that there is a subtle arrangement that GM has made here to avoid a claim of predatory pricing on All Star. But still, if you are absent and not paying the 14%, this is predatory pricing on its face. I mean, they could not survive at charging the price they do except you come in the back door and give them the money that then the plaintiffs here can't prove a predatory pricing because you've slipped in the back door and given them some money. It's not the back door at all, and that's not what's alleged. That's the way I look at it. That's not what's alleged in the complaint at all. So let's see what's alleged in the complaint. If we go to paragraph 82 of the complaint, I'm not making this up. I'm going to quote it to you. It says, All Star, quote, would not have agreed to participate in the program but for the suggestion of GM and the promise of partial recoupment or kickback, as they like to call it, of 14% of the cost of the goods sold. And then in their brief to this court on page 4, they say, without such an incentive, All Star likely would not lower its prices below its average variable cost and would not voluntarily assume such a loss. So what's going on? The commercial reality, and antitrust focuses on commercial reality. The commercial reality is that you're putting somebody out of business by predatory pricing is what it is. It may not be. You can't prove it because of the way you've got your system set up. But they are selling at a price that is below what All Star could possibly make except for you coming in and giving them 14%, and it's having the same effect. It is depriving them of customers because you are selling at a lower price than they can possibly afford. And the selling at a lower price than who could possibly afford? If they are selling, then All Star could without your 14%. If the import of the allegations, which is all we have to deal with, is that when All Star makes its price decision, before it makes its price decision to sell a part to a body shop, it knows that if it follows the procedures in the program, it's going to get the rebate. It knows it. Now, a rebate is a common form of discounting. You get them all the time when you go to the grocery store or when you buy a TV. Rebates are not unusual. They're not the back door. In this case, we're not talking about rebates that you get in a newspaper on Sunday. What we're talking about here is this particular case, and there's something about this case that disturbs me. Well, let's talk about what might disturb you. And it's the big boys squeezing the little ones out. That's what it is. You don't know if we're the big boys or the little ones. But then, on the other hand, that's not my concern. That's not the concern of antitrust laws particularly because we're concerned about the consumer. But then the consumer is ultimately going to get squeezed out or have his prices raised because you're going to squeeze out the competition. Let's talk about that. And you're doing it because you're a big boy. Let's talk about that. Is there any allegation that they're underselling where the plaintiff could sell at? I mean we don't know what Felder's could sell at, right? There's no allegation in it that's factual in any way, shape, or form. Only a conclusory allegation. A conclusory. I can't speak today. A conclusory allegation that says something to the effect of we can't meet it. They never give us an example. They never tell us it ever happened. They use only the program aftermarket average. We don't know if they sell below or above or equal to that because it's not alleged. There's just nothing in the complaint about this. Okay, let's go to the Supreme Court just for a minute, and I think it will help address what this case is really about beyond the temporal issue. Supreme Court, Brooke Group. Seminal case. Brooke Group. It's in our briefs. It's in all of the Fifth Circuit decisions on this. It's the case. That below-cost pricing may impose painful losses on its target, we'll say Felder's, is of no moment to the antitrust laws if competition is not injured. So what has to happen? What has to happen is this complaint has to contain sufficient factual information to show that competition is injured. And what this case says next and what all the Fifth Circuit cases say on the subject is that you have to allege a relevant market and you have to allege that in the future, in the future, after you've driven competitors out through low-cost pricing, we'll assume it's below cost for the moment. I'll assume it with you. It's not, but I'm going to assume it with you. Once you drive them out, then you have to show that what remains in the market and the structure of the market is such that in this case, All-Star can raise its prices so high to super-competitive levels that it can recover whatever it lost, whatever it invested in the below-cost. We're assuming it's below cost. It's not, but we're assuming it, as well as profit. Why? Because a rational businessman wouldn't engage in below-cost pricing unless there was a reward at the end. And the Fifth Circuit says, let's take a look at the end first. That might be the easiest way to deal with the case because if recoupment is implausible, then there's no case. You can't infer that anything was predatory at all. And my objection with what you were saying was the use of the word predatory before we get to the key question of recoupment. So what's wrong with the complaint? The complaint tries to allege a geographic market. It does so only with reference to the area that it operates in and the area that All-Star is. So what you get is a geographic market that's this configured group of parishes in Louisiana and counties in Mississippi only. There are no allegations about the rest of what you have to show for a geographic market. None at all. Zero. What are they? What are they? What do you mean? The key question is not where the defendant and the plaintiff operate, but where do the consumers, the body shops, where can the body shops turn? Where can they go? Where do they go for supply? And the question, according to the Fifth Circuit in the FMC case, is not where do they go now, where do they go today, but where will they go in the future when the prices are so high? That's the question. That's what the Fifth Circuit has always required. This is all a matter of pleading. Is that what you're saying? I mean, to a large extent, the case has not been pled properly. It could be pled properly, you're saying. Well, no. It can't be pled properly. And plus, they've already had two chances. But it is a case of pleading because we're hearing a motion to dismiss. And so, of course it is. But it's also a question of what's going on here? What did the district court tell them they needed to plead? And he used Fifth Circuit jurisprudence to do it. What did they plead after getting discovery? So, they start with a geographic market and they don't plead the facts that are necessary. They do plead another fact elsewhere that absolutely contradicts what they said. Remember, they say that this market is this small area of parishes and counties in central and southeastern Louisiana and southern Mississippi. Now, it's worth noting that All-Star operates out of Baton Rouge and Felder's operates out of Baton Rouge. But they also pled when they started talking about injury. They pled that this guy up in Shreveport competes with them. Whoa. That's critical. And it contradicts everything that they were saying. Because that's the only fact in the complaint that is actually alleged that says where are the other competitors and where are they coming from? And that fact says that body shops in Alexandria, which is in this little bitty market that they have, go to Shreveport just as they go to Baton Rouge. But guess what? Shreveport's not in their market. They don't include it. And they don't include – I'll give you another example. They say they compete from Baton Rouge.  Nothing is said about why body shops in Jackson, Mississippi can't go to Birmingham, couldn't go to Memphis. Memphis is just straight up I-55. Nothing. No economic impediments. No entry barriers of any kind. So what the district court found, and the district court is absolutely correct on this, is that they addressed in their second time, after discovery, and after being told what they needed to plead, they didn't. They didn't plead where buyers can turn for alternatives. And so no relevant market has ever been pled properly in this case. And this court, several times, has ruled on motions to dismiss that if you don't have a relevant market, we're done. Now, how does that really apply when we get to recoupment, which is ultimately the goal in a predatory pricing campaign? Well, remember what we said. You start with today, and you're doing low prices. You drive your competitors out. Then you have to get to a period where you, within the proposed relevant market, which is this little bitty area in Baton Rouge in southern Mississippi, that within that area, you can jack your prices up so high that they get to super competitive levels, and you can earn back all your losses and earn your monopoly profits. And plaintiff has to prove that. Now, we're on a motion to dismiss, so they have to plead it. So what do they say? They say, entry barriers are high and difficult. That's a quote. That's all they say. Entry barriers are high and difficult. They don't say they will be. They say they are now today. Entry barriers are high and difficult. What are entry barriers? These are the concept of economic impediments for consumers to be at body shops to be able to turn outside the market or for people from outside the market to come in. Nothing's there. Nothing at all. They have to plead this, not about what happens today, but what would happen when the prices are high. There's not one word in this complaint on that subject. And for that reason alone, you can drop the whole thing. And that's why it's not predatory, Judge Jolly, because if you can't recoup it, the Supreme Court tells you and this court tells you too, you would never engage in predatory pricing in the first place. Cutting prices is the essence of competition. The courts have extreme, the Fifth Circuit's word, extreme skepticism about these claims because it's so hard to tell the difference between the cutting prices to increase business that's competitive and cutting prices when it's not. And that's why you have to plead all of these things. And they fail on all of the levels that we've said in our brief. And I see I only have a second here. I can't even get to my injury, which is my favorite topic. Let me simply say this one more time. I've been practicing a long time. There's nothing in this case, this antitrust case, about a real-world transaction of any kind. Nothing. It's not there. It's all about a part-by-part analysis, and yet the complaint says it's not done in real world on a part-by-part analysis. Body shops buy on a repair order, which are multiple parts. And there's nothing in the complaint that ever says that All Star ever sold anything in a multiple-part entire transaction with a body shop below cost. Thank you for your time. I appreciate it. Thank you, Mr. Adler. Mr. McClone, you can try to straighten this out. Judge Jolly, I think you're absolutely correct. Again, the point here is to protect consumers. It's to protect competition. But the problem is the recoupment and the facts that have been pledged show that they're going to make recoupment. Well, I mean, I don't know about that because it seems like your market is so—the one you defined is so small, but yet the availability of these parts from people who are not affected by this arrangement are immediately available in, you know, as far as Daxton is concerned. And in Memphis, I mean, you've defined your geographic market so that competition is not ultimately affected or the price to the consumer is not affected. Well, Your Honor, the district court found that we had pledged sufficient facts to show where buyers can turn to for other sellers for supplies. It found that we had included allegations to support the inference that it was difficult for people to move into this market. The district court ultimately rested on two things. And we've already addressed that. The presence solely of a nationwide seller does not, as GM would have you believe, suggest that the market has to be nationwide in scope. The court's opinions in Wampler and Apani don't, you know, lend to that conclusion. Those involved AT&T and Coca-Cola, which I don't think anybody's going to dispute are nationwide companies, but the courts there were concerned because the market that was alleged was so narrow that it was specific business units. And those are the cases. But the people that you're saying are affected by this practice of General Motors and the consumer have so many other ways to turn to that ultimately the consumer is not going to be affected by whatever happens to your client. Well, those are fact issues I think that have to be developed in discovery, Your Honor, as to whether or not somebody in Jackson can go to Memphis or whether somebody in Lake Charles can go to Houston. I mean, I think we assume that in terms of arriving at a legal conclusion. I mean, antitrust law is, I guess, sort of notorious for judges making findings of facts like that. But the courts have stated repeatedly they're loathe to dismiss a case for failure to plead a geographic market on a 12B6 standard. And the only instances where they've done it that I could find, and the cases certainly from this court that are cited by the district court and by GM are where the market is defined so incredibly narrow that the court says you're compressing the market into these constrained specific units, whether in Wampler it's the multi-dwelling units as opposed to the city as a whole or in Aponi it's the city-owned businesses where the market says, no, it should be the city of Lubbock, that those kind of inferences are something that should be left to discovery. GM brings up this whole thing about real world examples. They've never contested that before. They never contested that before the district court. That was never an issue that was raised or addressed by the district court. That's being raised for the first time here. There are facts that are pled and the program is going on. The program is being done. And they're certainly advertising and telling All Star and telling other parties this is how you should be selling your parts, telling its other dealerships this is how you should be selling your parts. And the proof of the harm is what's happening to Felder's business, what's happening, as we've alleged, to other businesses in the area. We know what's happening to Felder's business, and that is that it's being decimated. That's correct. But then we say, well, we certainly regret that, and that's most unfortunate. But that is no concern of us in this case because what we're trying to do is protect the consumer, and the consumer can go to so many places. Even if your plaintiff goes belly up, the consumer can go to many other places and get a competitive price. Well, but the facts, as alleged in the complaint, Your Honor, is that that's simply not available to them, that they're simply a limited, there is a decreasing location for our purchasers to go, for our body shops to go at this point in this market. They're not looking, they can't go nationwide. Everything has to be, it's relationship driven and it has to be a prompt service, and you're not going to get that looking to Boston or New York. Absolutely, you know, no question about it. We're going to take a very, very careful look at all of this, and whatever we've said today, once we get into the record, may be things that we're ashamed to say. I like speaking for myself. Thank you, Your Honor. Okay, good. Thank you very much. That concludes the cases on the oral argument calendar for today. This panel will be reconstituted tomorrow. We're going to run our off.